UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICHARD GONZALES,<br><br>    Plaintiff,<br><br>  v.<br><br>MICHAEL J. ASTRUE[1], Commissioner of Social Security,<br><br>    Defendant. | CASE NO.  C06-5403RJB-KLS<br><br>REPORT AND RECOMMENDATION<br><br>Noted for June 22, 2007 |

Plaintiff, Richard Gonzales, has brought this matter for judicial review of the denial of his applications for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 36 years old.[2] Tr. 31. He has a high school equivalency diploma, two years of

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who recently became acting Commissioner of Social Security, hereby automatically is substituted for Joanne B. Barnhart.

[2] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

community college course work and past work experience as a security guard, maintenance worker, pizza delivery driver, transmission mechanic, mechanics helper, assembly mechanic, cook, pizza hut manager, and printer's helper. Tr. 71, 76, 102, 488.

On January 16, 2001, plaintiff filed applications for disability insurance and SSI benefits, which were denied initially and on reconsideration, alleging disability as of December 10, 2000, due to a seizure disorder, degenerative disc disease of the lumbar spine and depression. Tr. 31-33, 64-66, 402-06, 409-10, 474. Plaintiff later added bilateral foot fibromas as a disabling impairment. Tr. 474. A hearing was held before an administrative law judge ("ALJ") on March 24, 2003, at which plaintiff, represented by counsel, appeared and testified. Tr. 415-24. A vocational expert also appeared at the hearing, but did not testify. Id. That hearing was re-scheduled, however, due to a need to further develop the record. Tr. 474. At the second hearing, held on October 21, 2003, plaintiff, represented by counsel, appeared and testified, as did plaintiff's mother, as well as both a medical expert and a vocational expert. Tr. 425-70.

On December 12, 2003, the ALJ issued a decision, determining plaintiff to be not disabled because he was able to perform other work existing in significant numbers in the national economy. Tr. 495-509. Plaintiff's request for review was denied by the Appeals Council, upon which plaintiff filed an appeal of that decision with this Court. Tr. 519, 523. Based on the stipulation of the parties, on January 12, 2005, the Court remanded this matter to the Commissioner for further administrative proceedings, which in turn sent it back to the same ALJ by the Appeals Council. Tr. 523-26, 528-31.

A third hearing was held before that ALJ on August 15, 2005, at which plaintiff, again represented by counsel, appeared and testified, and at which a vocational expert also appeared but did not testify. Tr. 705-13. That hearing too was adjourned and re-scheduled to allow for the submission into the record of additional medical evidence. Tr. 475. On February 2, 2006, a fourth hearing was held, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert and the same medical expert who testified at the second hearing. Tr. 714-27.

On March 27, 2006, the ALJ issued a second decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the disability evaluation process,[3] plaintiff had not engaged in substantial gainful activity during the relevant time period;

(2) at step two, plaintiff had "severe" impairments consisting of drug and alcohol abuse, a personality disorder and degenerative disc disease;

(3) at step three, the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.09 were met when considering the impact of plaintiff's drug and alcohol abuse, but he was not eligible for benefits on this basis,[4] and without consideration of that impact, none of his impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) at step four, without considering the impact of drug and alcohol abuse, plaintiff had the residual functional capacity to perform a modified range of light work, which precluding him from being able to perform his past relevant work; and

(5) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy absent his substance abuse.

Tr. 490-91.  It does not appear from the record that the Appeals Council assumed jurisdiction of the case. 20 C.F.R. § 404.984, § 416.1484.  The ALJ's decision therefore became the Commissioner's final decision after sixty days. Id.

On July 20, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits, or, in the alternative, for further administrative proceedings for the following reasons:

(a) the ALJ erred in finding plaintiff's foot fibromas and seizure disorder to be not severe;

(b) the ALJ erred in assessing plaintiff's credibility;

(c) the ALJ erred in assessing plaintiff's residual functional capacity; and

(d) the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.

---

[3] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

[4] A claimant may not be found disabled if alcoholism or drug addiction would be "a contributing factor material to the Commissioner's determination" that the claimant is disabled. Bustamante v. Massanari, 262 F.3d 949, 954 (9th Cir. 2001) (citing 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J)).

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.  The ALJ's Step Two Analysis Was Proper

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." Id. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), ( c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ determined plaintiff's drug and alcohol abuse, personality disorder and degenerative disc disease to be severe impairments. In addition, the ALJ specifically found plaintiff's foot fibromas to be not severe due to the lack of evidence of "clinical etiology" and physical limitations in the record and the "questionable duration" of that condition. Tr. 477. The ALJ also found plaintiff's seizure

REPORT AND RECOMMENDATION
Page - 4

disorder to be not severe for the following reasons:

> [T]he claimant's alleged seizure impairments are most likely substance induced by prescription medication abuse, resulting in inebriated physiologic responses. . . . [T]he record does not reflect any diagnosis of seizures and I find the claimant's alleged seizure disorder is "non-severe," without considering the impact of drug and alcohol abuse.

Tr. 478. Plaintiff argues the ALJ improperly determined these two impairments to be not severe. The undersigned disagrees.

### A. Foot Fibromas

In mid-February 2004, plaintiff was found to have "a few thickened masses over the plantar fascia region" of both his right and left feet, with the mass on the left foot being "painful to touch." Tr. 662. He was diagnosed with "[l]ikely plantar fibromas over the plantar fascia bilaterally." Id. Similar findings were made the following month. Tr. 657, 660. The physician who treated him at the time though commented in relevant part as follows as well:

> It sounds as if he wants to [sic] me to just write a note saying that he cannot work because of the foot pain. I told [sic] I will not do this since I think the first step is to try the shoe inserts [he stated he was going to get] to help decrease weightbearing on the fibromas.

Tr. 657. In early October 2004, plaintiff reported being in "a lot of pain" due to his plantar fibromas, but the physical examination performed at the time was unremarkable concerning functional limitations. Tr. 648-49. In early November 2004, furthermore, plaintiff reported "doing well," with "minimal discomfort," except when "ambulating too much," following additional surgery done on his left foot. Tr. 646. Indeed, "minimal tenderness" was noted during the physical examination, and plaintiff was found to be "doing well." Id.

Plaintiff continued to report "doing well" in mid-November 2004, and even stated that his left foot felt "great." Tr. 643. He again was noted to be "doing well at this point," and was told he was "free to get back to full weightbearing gradually as tolerated." Id. While new tender fibrous masses were found on his feet in early January 2005, as before, plaintiff was not assessed with any functional limitations as a result thereof. Tr. 642. Plaintiff again was diagnosed with "[w]orsening of the foot pain after surgery" on his fibromas in late March 2005, as he reported having "considerable pain in the plantar area" on examination. Tr. 641. However, in late April 2005, plaintiff was noted "to be better pain-wise." Tr. 640.

While it is clear, therefore, that plaintiff has been diagnosed as having foot fibromas, there is no

objective medical evidence in the record showing those fibromas have caused limitations which more than minimally affect his ability to perform basic work activities, as required to establish a severe impairment at step two. In addition, the evidence in the record that plaintiff is suffering from significant pain due to his fibromas comes primarily from his own self-reports. Although a claimant's pain and other symptoms must be taken into account here (see 20 C.F.R. § 404.1529), the determination as to impairment severity is made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself. <u>At the second step of sequential evaluation, then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities.</u> If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed. Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added). That evidence simply does not support the contention that plaintiff's foot impairment is severe. As discussed below, furthermore, the ALJ did not err in finding plaintiff regarding his pain and symptom testimony to be not fully credible.

B.      Seizure Disorder

Plaintiff's claims regarding his alleged seizure disorder are similarly without merit. In early May 2000, plaintiff was diagnosed with "[s]ubjective vertigo" and a "possible anxiety disorder." Tr. 128. During two other physical examinations performed around that time, plaintiff was diagnosed both with "[d]izziness" and "[v]ertigo, most likely peripheral but some atypical features" respectively. Tr. 185-86. However, except for some elicited dizziness, his neurological examinations were essentially normal. Id. In mid-June 2000, plaintiff reported his vertigo had been "improving" and had "not gotten in the way of his work or daily activities." Tr. 179. This time, he was diagnosed with "[m]ild vertigo," that seemed "to be improving now over time." Id.

In late June 2000, plaintiff denied having seizures, but did admit to intermittent "dizzy spells." Tr. 175. His neurological examination at the time was noted to be "[f]airly unremarkable." Tr. 177. It also was postulated that plaintiff possibly had "an inner ear dysfunction" which was "not currently evident," or that "his pain medications might be affecting his equilibrium." Id. He was diagnosed with dizziness and

1  giddiness. Id.  In late November 2000, plaintiff again had a fairly normal examination, after which he was
2  diagnosed with an "[u]nknown disorder." Tr. 162.  However, what he was describing was noted to be
3  "definitely not seizure." Id.  In early December 2000, plaintiff was diagnosed with "[s]eizure disorder v.
4  hyperventilation." Tr. 161.

5       A physical examination performed by William S. Herzberg, M.D., in mid-December 2000, largely
6  was unremarkable, and this time the diagnosis provided was that he "might have primary sensory seizure
7  with secondary spread to motor cortex." Tr. 310-11.  An electrodiagnostic study completed in late January
8  2001, however, was not indicative of a seizure disorder. Tr. 308.  Further, although "some left temporal
9  slowing" was noted by Dr. Herzberg, he felt it was "not enough and on the wrong side to account for his
10 symptoms." Tr. 307.  Thus, while it was "perhaps compatible with a seizure disorder," Dr. Herzberg also
11 thought he "might have narcolepsy." Id.

12      The record does contain a note from Dr. Herzberg, dated February 5, 2001, asking that plaintiff be
13 excused from work "until further notice" due to his electrodiagnostic "abnormalities and possible seizure
14 disorder." Tr. 306.  In late March 2001, however, Dr. Herzberg stated that the cause of his symptoms might
15 be either narcolepsy or seizures. Tr. 305.  Also in late March 2001, plaintiff reported that he was having
16 "some shakes, mostly at night" when he went to bed, but had "not had the frank seizures." Tr. 251.  In early
17 May 2001, Dr. Herzberg opined that plaintiff's symptoms might be attributable in part to sleep apnea,
18 though "fairly mild," and that he was "less convinced" that plaintiff was "troubled by occult seizures." Tr.
19 304.  In late January 2002, Dr. Herzberg opined that the seizures of which plaintiff complained might
20 "possibly" be "true seizures" or they might be "pseudoseizures," though the "left temporal slowing" did
21 suggest "an organic abnormality." Tr. 303.

22      Plaintiff was examined in mid-September 2002, by Supranee Amy Nopachai, M.D., who thought
23 that "some of his symptoms" might "be related to panic attack," and that his medication for that condition
24 also might "be helping in this respect." Tr. 684.  In early October 2002, Dr. Nopachai diagnosed plaintiff
25 with a "[h]istory of dizzy spells/blurred vision," but commented that it still was "unclear" to her "whether or
26 not he actually had a seizure in the past or if this may be related to his sleep apnea." Tr. 677.  No other
27 more recent physical examination of plaintiff mentioning in clinical findings or diagnosing him as having
28 seizures or a seizure disorder is contained in the record.  Indeed, as noted above, plaintiff's physicians are
not even in agreement on a specific diagnosis for his reported symptoms.  None of that medical evidence,

REPORT AND RECOMMENDATION
Page - 7

furthermore, reveals this condition has resulted in any work-related limitations. Accordingly, the ALJ did not err in finding no severe impairment here as well.

II. The ALJ Properly Discounted Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

Plaintiff argues the ALJ abused his discretion by improperly discounting his testimony in several areas. First, plaintiff asserts the ALJ minimized his complaints regarding his seizure disorder and related cognitive difficulties in finding "no evidence denying or detracting from" the diagnoses of John Kaiser, M.D., that plaintiff's "'dizziness, is secondary to excessive use of Darvocet.'" Tr. 477. The undersigned agrees the ALJ erred in so finding, as it appears the portion of the record to which he cited consists of two treatment notes provided by treatment providers other than Dr. Kaiser. See Tr. 185-86. Neither of those

1  providers, furthermore, made the specific opinion the ALJ attributed to Dr. Kaiser.  However, the ALJ did
2  not offer this as a reason for discounting plaintiff's credibility, and, as discussed above, properly found his
3  seizure disorder to be a non-severe impairment.

4       Plaintiff next argues the ALJ ignored evidence in the record showing that he was examined by
5  treatment providers who diagnosed him with vertigo due to labyrinthitis, and who recommended further
6  studies if symptoms persisted.  Again, however, the medical evidence in the record supports the ALJ's
7  determination that plaintiff's seizure disorder was not severe.  Indeed, also as discussed above, plaintiff's
8  treatment providers could not even agree on what was causing his alleged seizures, nor did any of them
9  indicate any significant work-related limitations resulting therefrom.  It is true that there is no treatment
10 provider in the record who expressly discounted plaintiff's complaints.  No clinical findings were produced
11 to substantiate those complaints though, and the objective medical evidence in the record clearly shows his
12 symptoms to have been largely subjective in nature.  Plaintiff argues that uncertainty regarding specific
13 etiology is a common problem in medicine.  Be that as it may, plaintiff still must show the severity of his
14 complaints have a sufficient basis in the medical evidence, which he has not done here.

15      Plaintiff also takes issue with the following findings made by the ALJ:

> At the second hearing, the claimant stated he still has seizures, adding he has had a "few" with the last one "maybe a week ago."  He added that he has had a seizure "once every week and a half," and when he realizes he is about to have one he takes Klonopin. There are no updated medical records regarding any seizure activity, since his previous unfavorable decision.  His claim of continuing on Klonopin is also not credible as the medical evidence of record reflects his last prescription of Klonopin was made in July of 2003, with no evidence of continued prescribing from any source (Ex. 21F/pgs. 346-347).

Tr. 481.  Plaintiff asserts that the ALJ was wrong in so finding, and that the evidence in the record shows he continued to be diagnosed as having a seizure disorder and be prescribed Klonopin on a number of occasions subsequent to the prior unfavorable decision.  As discussed above, however, early October 2002, was the last time any diagnosis related to his seizure disorder was made, and even then the diagnosis that was provided consisted of "[h]istory of dizzy spells/blurred vision," and "unclear" as to "whether or not he actually had a seizure in the past." Tr. 677.  The specific record citations made by plaintiff, furthermore, do not support his assertions on this issue.

     Thus, for example, plaintiff points to an early October 2004 treatment note, wherein under the past medical history section is listed "[s]eizure disorder" and under the medications section is written Klonopin.

REPORT AND RECOMMENDATION
Page - 9

1  Tr. 648. It is clear, however, that this information is part of the subjective portion of the treatment note, in

2  which the patient relates, or reference is made to, his or her symptoms and social and past medical history.

3  See id. Indeed, no diagnosis of seizure disorder or prescription for Klonopin was provided at the time. See

4  Tr. 648-49. In other words, there is no clear indication that the references to seizure disorder and Klonopin

5  were made in regard to the present state of plaintiff's medical condition. The same is true with respect to

6  the other citations to the record plaintiff makes. See Tr. 651-54, 661-64.

7  Plaintiff argues the ALJ was biased against him, as evidenced by the following finding he made:

8  > Dr. [Caleb] Burns . . . noted that while the claimant denied any legal difficulties,
9  > including DUI's, etc., the record reflected that he had been arrested and spent some time
   > in jail for substance abuse. The claimant then admitted that he no longer has a driver's
10 > license to Dr. Burns. When asked why he no longer has a license his only reply was "I
   > lost it. But my wife has been driving me for a long time." (Ex. 5F/pgs. 144-45). I find
11 > the claimant's answer regarding the loss of his driver's license is vague and evasive.

12  Tr. 482. The undersigned agrees that the record fails to indicate plaintiff was specifically asked why he no

13  longer had a driver's license. See Tr. 264. The undersigned further agrees that plaintiff's statement to Dr.

14  Burns regarding his driver's license as described in Dr. Burns' evaluation is neither vague or evasive. Nor

15  does it appear Dr. Burns linked this statement to his past legal difficulties. See Tr. 263-64. As such, there

16  appears to be no legitimate basis in the record for the ALJ's conclusion here. Nevertheless, while the ALJ

17  erred in so concluding, plaintiff has failed to demonstrate the existence of bias.

18  The requirements of due process demand "impartiality on the part of those who function in judicial

19  or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982). Hearing officers who

20  decide social security claims are presumed to be unbiased. Id. This presumption, however, "can be rebutted

21  by a showing of conflict of interest or some other specific reason for disqualification." Id. The burden of

22  establishing such a disqualifying interest "rests on the party making the assertion." Id. at 196. That party

23  must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear

24  inability to render fair judgment.'" Rollins v. Massanari, 246 F.3d 853, 858 (9th Cir. 2001) (citing Liteky v.

25  United States, 510 U.S. 540, 555-56 (1994)). In addition, "actual bias," rather than the "mere appearance

26  of impropriety," must be shown in order to disqualify an ALJ. Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th

27  Cir. 2003). Plaintiff has not shown the ALJ's behavior, i.e., his erroneous finding, was so extreme that it

   rose to the level of actual bias in this case.

28  As another example of bias, plaintiff argues the ALJ improperly discounted his claims that his feet

1  and back limitations are exacerbated by walking, and that he had to do more walking because of increased
2  child care activities, on the basis that "earlier records reflect he gets his children for 'four weeks at a time'
3  during the summer." Tr. 483.  Instead, plaintiff asserts, the record actually reflects he has six children, only
4  two of whom currently live with him and his wife.  The undersigned, though, sees no inconsistency here.
5  While plaintiff did report that he has had two of his six children with his wife, he also reported that he was
6  depressed "after his four other children left from their five week visit." Tr. 263, 266.  Although the ALJ got
7  the amount of time wrong, these statements are not mutually contradictory.

8         In addition, the ALJ was using the evidence of plaintiff's visit with his children for the purpose of
9  discounting the allegation made by him and his wife that "the only solution to *their* pain problem" was to
10 increase his methadone. Tr. 483 (emphasis in original).  The ALJ noted that the record showed plaintiff's
11 "allegedly increased pain in his feet and back were because" of his increased activity at home. Tr. 483, 486.
12 Thus, for example, in late March 2005, plaintiff reported that he was "getting a lot of back pain," because
13 he had "to walk more because his wife" went to work, and he had "to take care of the children." Tr. 641.
14 In late April 2005, he reported a continued need for methadone, as he was "taking care of 4 or 5 children at
15 home," did "all the housework," and tried "to do some part-time work with the family," which, incidently,
16 contradicts his implied claim that he took care of only two of his children. Tr. 640.

17        Plaintiff argues the ALJ erred in making the following finding as well:

18     [A]t the March 2003 hearing, the claimant listed his medications as Methadone and
    Klonopin only, adding that he had been ceased on Darvocet 1 to 1½ years ago.  His
19     testimony regarding the narcotic Darvocet is contravened as updated medical evidence
    of record reflects he was prescribed the medication through July 2003 (Ex. 21F/pg.
20     346).  In other words, he testified falsely under oath in 2003.

21 Tr. 484.  Specifically, plaintiff asserts there is no medical evidence in the record that supports the ALJ's
22 conclusion that he was prescribed Darvocet in July 2003 or earlier.  The document in the record cited by the
23 ALJ, however, does indicate plaintiff was scheduled for a Darvocet refill on July 11, 2003, and was to last
24 until July 21, 2003. See Tr. 632.  Plaintiff argues this "clearly evidences handwriting by an unknown
25 individual that may have mistakenly entered Darvocet as a medicine with incorrect dates." Plaintiff's
26 Opening Brief, p. 16 (Dkt. #12).  That document though was signed by a registered nurse, and plaintiff
27 presents no evidence showing the entry made for the Darvocet refill was a mistake or otherwise incorrect.
28 Thus, it was not improper for the ALJ to have relied on it to make his finding.  In addition, Dr. Nopachai

REPORT AND RECOMMENDATION
Page - 11

1  expressly stated in her July 23, 2003 examination report as follows:

2  > I did prescribe Tylenol No. 3 on June 17, 2003, as well as Darvocet on July 11, 2003.
3  > <u>Patient admits to taking these pills but more often than what was prescribed.</u>

4  Tr. 665 (emphasis added). This clearly contradicts plaintiff's claims regarding this issue.

5  Plaintiff next challenges the following finding made by the ALJ:

6  > I have reviewed the updated medical evidence of record regarding the alleged nature and
7  > severity of his foot fibromas and subsequent surgery . . . The record contradicts his
8  > testimony regarding treatment of his feet. Specifically, he was prescribed shoe inserts
   > after his right foot surgery in mid-October 2004, not before. While he has developed
   > additional sores on his left foot, he has not had surgery to that foot (Ex. 21F/pgs. 335-
   > 338).

9  Tr. 476. Plaintiff argues the ALJ erred in so finding, as he never explained the timing of when the shoe

10 inserts were explored as a treatment option, but rather it was the ALJ who offered this chronology of events

11 at the February 2, 2006 hearing, and then held him responsible for that error. It is true that the ALJ stated

12 at the hearing that it was his understanding that plaintiff's physician recommended shoe inserts, but that

13 plaintiff did not want them, and so eventually had surgery. Tr. 718. In his response, however, plaintiff did

14 not appear to disabuse the ALJ of his understanding. Tr. 718-19. The record, furthermore, does show the

15 shoe inserts were prescribed after surgery was performed. Tr. 642-43, 645-46, 648-49, 659-60.

16 Lastly, plaintiff argues the ALJ attempted to improperly discount his credibility in finding that it

17 appeared his "failure to comply with" his "narcotic pain medication usage contract resulted in Dr. Kaiser

18 discontinuing care." Tr. 478. The undersigned agrees the ALJ erred in making this finding. While it does

19 appear from that portion of the record the ALJ cites to support his finding that plaintiff was not taking his

20 medication as prescribed and thus was non-compliant in failing to do so (<u>see</u> Tr. 155-59), that evidence

21 does not actually show plaintiff was discharged from Dr. Kaiser's care, let alone that this was the stated

22 reason for such discharge. Nevertheless, again the ALJ did not set this forth as a specific reason for

23 discounting plaintiff's credibility. Even if the ALJ had, however, as discussed below, he gave many more

24 legitimate reasons for finding plaintiff not entirely credible.

25 As can be seen, therefore, while the ALJ did make some of the errors alleged above in evaluating the

26 evidence in the record, he also properly discounted plaintiff's credibility on the basis of inconsistent

27 statements, engaging in activity at a level that contradicted his alleged need for increased methadone, and

28 lying under oath at the March 24, 2003 hearing. Thus, the fact that some of the reasons for discounting

plaintiff's credibility may have been improper, does not render the ALJ's credibility determination invalid, as long as it is supported by substantial evidence in the record, as it is in this case. Tonapetyan, 242 F.3d at 1148. Indeed, as shown above, most, if not all, of the errors plaintiff points to above went not to the ALJ's assessment of his credibility, but his evaluation of certain portions of medical and other evidence in the record in general, none of which the undersigned finds to be sufficient in themselves to reverse the ALJ's decision. In any event, in addition to those valid reasons the ALJ provided for finding plaintiff not fully credible noted above, other equally legitimate reasons were given as well.

The ALJ, for example, also noted that plaintiff provided contradictory testimony regarding his workers' compensation claim. Tr. 484. The ALJ further noted that despite his claims that his methadone prescription had been reduced by his treatment provides, the record reflected that plaintiff consistently demanded higher dosages of that drug, and that at least one of his treatment providers expressed concern regarding "prescription drug abuse and drug seeking behavior. Tr. 485-87. This too was a proper basis for discounting plaintiff's credibility. See Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001) (ALJ properly considered claimant's drug-seeking behavior).

The ALJ also properly considered the "many inconsistencies" Dr. Burns found between plaintiff's self-reports and the evidence contained in the record. Tr. 262-63, 485. The undersigned further notes along these lines that while Dr. Burns found "no clear signs of exaggeration or malingering," he certainly felt it to be a possibility. Tr. 266, 268. While this is not a sufficient basis for finding actual malingering, certainly it is a factor the ALJ may consider in determining plaintiff's overall credibility. As noted above, evidence in the record shows plaintiff performed a significant range daily activities of living as well, such as "taking care of 4 to 5 children," doing "all the housework," and "trying to do some part-time work." Tr. 486-87. The ALJ properly relied on this evidence in part to discount his credibility. See Smolen, 80 F.3d at 1284 n.7 (testimony of claimant may be rejected if he or she is able to spend substantial part day performing household chores or other activities transferable to work setting).

The ALJ discounted plaintiff's credibility in part because his allegations regarding his pain and the nature, severity and frequency of his seizures was not corroborated by the objective medical evidence in the record. Tr. 485-86. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166

REPORT AND RECOMMENDATION
Page - 13

F.3d 1294, 1297 (9th Cir. 1998).  Although plaintiff's pain and other symptom testimony may not be rejected solely because it is not supported by objective medical evidence, as discussed herein, the ALJ did provide other valid reasons for discounting his credibility.  See Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995); Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989); Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995).

      The ALJ also pointed to plaintiff's admission at the February 2, 2006 hearing that he had not sought or received treatment for his allegedly disabling depression. Tr. 486.  Failure to assert a good reason for not seeking treatment "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989); see also Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered physician's failure to prescribe and claimant's failure to request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription of physician for conservative treatment only suggestive of lower level of pain and functional limitation).  Here, plaintiff sets forth no reason as to why he did not seek such treatment.

      Lastly, the ALJ noted that plaintiff "was able to return to work for six years" following surgery he underwent on his back in 1994. Tr. 485.  The ALJ may discount a claimant's credibility on the basis of medical improvement, and may take into account his or her work record.  See Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999); Smolen, 80 F.3d at 1284; Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  Thus, while the period of time here to which the ALJ refers occurred prior to the date plaintiff alleged he became disabled, it does shed light on plaintiff's credibility, at least regarding his allegedly disabling back-related symptoms.  Accordingly, the undersigned finds that the ALJ provided sufficient and valid reasons for discounting plaintiff's credibility in this case.

III.    The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

      If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> I find the claimant is able to perform work activities at "Light" exertion . . . with a "sit/stand at will," option with postural, environmental and vocational non-exertional limitations. Exertionally, the claimant is able to "lift and carry" up to 10-pounds "frequently" and 20-pounds "occasionally." He can "sit, stand and walk at-will" not to exceed 6 hours (cumulatively, not continuously), for each activity in an 8 hour workday with normal breaks; his "push-pull" abilities are unlimited in his upper and lower extremities, to the weight limits he can "lift and carry," as set forth above. The claimant's postural non-exertional limitations allow that he can "occasionally" climb stairs and ramps, however he is precluded from climbing ropes, ladders and scaffolding. He can also do "occasional" bending, balancing, stooping, kneeling, crouching or crawling. Because of his drug and alcohol abuse history and methadone medication, the claimant has environmental non-exertional limitations to avoiding hazards, such as working at unprotected heights or around machinery with exposed moving parts, primarily due to narcotic pain medication side-effects.

Tr. 487.

Plaintiff argues the ALJ erred in failing to consider the effects of his foot fibromas and seizure disorder. As discussed above, however, the ALJ properly found those alleged impairments to be non-severe in light of the lack of objective medical evidence in the record showing any significant functional limitations resulted therefrom. Indeed, plaintiff points to no specific "effects" stemming from either of these impairments he insists the ALJ should have considered in assessing his residual functional capacity. Plaintiff asserts the ALJ should have further developed the record regarding his feet fibromas. The ALJ's duty to further develop the record though, "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). Such is not the case here as discussed above.

Plaintiff insists the ALJ was wrong in finding his foot fibromas and seizure disorder resulted in no work-related restrictions, arguing the ALJ reached this determination without any medical opinion source evidence to support that finding. Plaintiff also asserts the ALJ simply ignored these impairments and the

REPORT AND RECOMMENDATION
Page - 15

symptoms and limitations he alleges have resulted therefrom. First, clearly the ALJ did not "ignore" any of these issues, as he expressly addressed them in his decision as discussed above. Second, plaintiff's fails to understand that it is his burden to come forth with medical evidence that supports his claims of disabling impairments and limitations. While the ALJ does have a duty "to fully and fairly develop the record and to assure that the claimant's interests are considered," the ALJ's duty to <u>further</u> develop the record comes into play only where the record is ambiguous or provides an insufficient basis on which make a determination. <u>Tonapetyan</u>, 242 F.3d at 1150 (citations omitted); <u>Mayes</u>, 276 F.3d at 459. As explained above, such is not the case here.

IV. <u>The ALJ Erred in Conducting His Step Five Analysis</u>

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). <u>Tackett</u>, 180 F.3d at 1100-1101; <u>Osenbrock v. Apfel</u>, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir. 1987); <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." <u>Embrey</u>, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001).

Plaintiff first argues that because the ALJ erred in assessing plaintiff's residual functional capacity, he also erred by failing to pose a hypothetical question to the vocational expert that contained all of this functional limitations. As discussed above, however, the ALJ did not err in making that assessment, and thus he was not required to include any additional limitations therein. Plaintiff further argues though that the hypothetical question the ALJ did pose to the vocational expert was incomplete, because it did not

1  contain all of the limitations the ALJ found he had. Specifically, the hypothetical question did not include
2  the environmental non-exertional limitations of "avoiding hazards, such as working . . . around machinery
3  with exposed moving parts." <u>See</u> Tr. 725. The undersigned agrees that the ALJ erred in failing to include
4  this limitation in the hypothetical question, and for that reason recommends this matter be remanded to the
5  Commissioner for further administrative proceedings.

6       Defendant admits the ALJ erred in not including this limitation in the hypothetical question posed to
7  the vocational expert, but argues such error was harmless. The undersigned disagrees. The vocational
8  expert identified three jobs plaintiff would be capable of performing based on the hypothetical question
9  posed by the ALJ: small products assembler (Dictionary of Occupational Titles ("DOT") 739.687-030;
10 electronics worker (DOT 726.687-010); and packing line worker (DOT 753.687-038). Tr. 726. According
11 to the DOT, a small products assembler may use hand tools, portable powered tools, bench machines, and
12 other machines, such as arbor presses, punch presses, taps, spot-welding and riveters. DOT 739.687-030.
13 An electronics worker may use spray guns, hand and power tools, transfer presses, "electro-etch" printing
14 devices, and heating equipment. DOT 726.687-010. While no specific power or other similar tools are
15 listed for a packing line worker, this job may involve placing items on a conveyor. DOT 753.687-038.

16      Defendant argues that none of the tools and other equipment listed above involve the presence of
17 "machinery with exposed moving parts." This, however, is not at all clear. No definition of the above kinds
18 of tools and equipment are provided. Certainly, a power tool, such as a drill, contains an exposed moving
19 part, i.e., the drill bit. In addition, while the undersigned is by no means an expert in machinery of these
20 types, it is entirely conceivable that presses, spot-welders, riveters and the like, and even conveyor belts, all
21 contained exposed moving parts. The record simply contains no information, vocational expert testimony
22 or otherwise, upon which a determination of this sort can properly be made.

23      Defendant notes that each of the DOT descriptions for these jobs contain a "specific vocational
24 preparation" section, in which the following is listed: "Moving Mech. Parts: Not Present – Activity or
25 condition does not exist." DOT 739.687-030; DOT 726-687-010; DOT 753.687-038. At first glance this
26 description may appear to be consistent with the limitation that plaintiff avoid machinery with exposed
27 moving parts. A closer examination, however, reveals that the two are not necessarily the same. Thus, for
28 example, the phrase "moving mechanical parts" does not completely equate with "<u>exposed</u> moving parts" in

REPORT AND RECOMMENDATION
Page - 17

all situations. In other words, a machine may have mechanical parts that move, but which are not open or otherwise exposed to touch, and it is not entirely clear from the language of the DOT encompasses such parts. Again, this is an issue for which vocational expert testimony was needed, but with respect to which no such testimony was obtained.

Accordingly, the undersigned finds this matter should be remanded to the Commissioner for further consideration of the above issues, including additional vocational expert testimony.[5] The undersigned also notes that an ALJ has the affirmative responsibility to ask the vocational expert about possible conflicts between her testimony and information in the DOT. Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999); SSR 00-4p, 2000 WL 1898704. Before relying on evidence obtained from a vocational expert to support a finding of not disabled, therefore, the ALJ is required to "elicit a reasonable explanation for any discrepancy" with the DOT. Haddock, 196 F.3d at 1087; SSR 00-4p, 2000 WL 189704 *1. The ALJ also must explain in his or her decision how the discrepancy or conflict was resolved. SSR 00-4p, 2000 WL 189704 *4. Thus, to the extent the vocational expert's testimony conflicts with the DOT's descriptions of the three jobs identified, the ALJ shall resolve that discrepancy as well.

V.       This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted). Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

---

[5] Defendant points out that the hypothetical question posed by the ALJ also did not include the limitation that plaintiff also avoid "working at unprotected heights." Defendant argues that this too constituted harmless error, as all three DOT job descriptions stated as follows: "High Exposed Places: Not present – Activity or condition does not exist." DOT 739.687-030; DOT 726-687-010; DOT 753.687-038. While plaintiff did not raise this as an issue for review, the undersigned once more disagrees with defendant that the ALJ's omission of this limitation from his hypothetical question was harmless. Again, a limitation to not "working at unprotected heights" is not necessarily completely covered by the statement that "high exposed" places are not present. That is, "unprotected heights" may encompass a bigger category than "high exposed" places. Thus, on remand, the Commissioner shall re-consider this limitation as well and it effects, if any, on plaintiff's ability to perform other work existing in significant numbers in the national economy.

1195, 1210 (9th Cir. 2001). Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because, as discussed above, issues still remain with respect to plaintiff's ability to perform other work existing in significant numbers in the national economy at step five of the sequential disability evaluation process, this matter should be remanded to the Commissioner for further administrative proceedings.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 22, 2007**, as noted in the caption.

DATED this 24th day of May, 2007.

/s/ Karen L. Strombom
Karen L. Strombom
United States Magistrate Judge